UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| LARRY AND JANA RINE, | ) |
| Plaintiffs | ) ) ) |
| v. | ) ) ) Civil Action No. 5:11-CV-4 |
| CHESAPEAKE APPALACHIA, LLC, | ) ) |
| Defendant. | ) ) ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Plaintiffs Larry and Jana Rine ("the Rines") respectfully submit this memorandum in support of their motion for the entry of a temporary restraining order and/or preliminary injunction enjoining the Defendant Chesapeake Appalachia, LLC ("Chesapeake") from continuing its trespass and property destruction on the Plaintiffs' real property in Wetzel County, West Virginia.

**Introduction**

The Rines are surface owners of a parcel where Chesapeake operates natural gas wells. Chesapeake created a pit on the Rine property in which it improperly disposed of wastes from its drilling operations. The edge of the well pad near the pit began to slip approximately three weeks ago and the Rines gave Chesapeake permission to enter the property to repair the slip, but instructed Chesapeake to take no action except to repair and stabilize the site. Chesapeake is flagrantly ignoring the Rines' requests and is carrying out a major and ill-considered earth moving operation on the Rine property. Separate from its gas production, Chesapeake and its

1

agents are currently unearthing and carrying away as many as 400 truckloads of the Rines' soil and a black waste material left on the property by Chesapeake, which initial tests suggest is contaminated with diesel fuel, benzene and other contaminants. See Plaintiffs' Exhibit A (lab analysis excerpt showing petroleum hydrocarbon levels in sampled soil). Chesapeake maintains the project is an "emergency slip repair" engineered solely to remedy a potential landslide at the edge of the pad.

Chesapeake's activities, however, are not limited to slip repair. Instead it is using the Rines' permission to repair the slip as an opportunity to carry out an unapproved toxic remediation plan. Chesapeake's claim that it is engaged in slip repair is a ruse. It is beyond dispute that Chesapeake is actually digging out large veins of black waste, along with large quantities of the Rines' real property, away from the actual slip, and that Chesapeake will not stop digging despite the Rines' instructions. Chesapeake claims a willful ignorance of the contents of the waste that it placed on the Rine property, even after the Rines tested the material and provided the results showing hazardous substances. Removal of the black waste is simply an ill-considered attempt to mitigate the Rines' property damages, without determining the waste contents or the contamination footprint and without implementing the necessary handling, disposal and remediation. Incredibly, since Chesapeake claims to not know what is in the black material, it is apparently not advising the landfill of its actual contents.

Chesapeake's right on the surface of the Rines' land is, at most, limited to activities reasonably necessary for the development of its mineral estate. Its current project is plainly not development of natural gas and must be enjoined as an act of trespass and illegal property destruction.

**Facts**

Larry and Jana Rine brought this action on November 10, 2010 in the Circuit Court of Wetzel County, West Virginia. Chesapeake removed the action to this Court pursuant to its diversity jurisdiction, 28 U.S.C. § 1332. The action is based in part upon a cornerstone of property law. The Rines, as landowners, have the right to exclude persons and things from their land. They did not approve Chesapeake's disposal of waste on their land. Even if Chesapeake has full mineral rights, its concomitant limited, implied right to temporarily use the surface does not include a right to use the Rines' land as a permanent waste dump.

The Rines' Complaint alleges that Chesapeake not only left a pit of waste onsite, but that Chesapeake made certain the waste was uncontained and prone to spreading throughout the Rine property. Evidence at trial will show that several witnesses watched and photographed Chesapeake intentionally rupture the liner of the waste pit to allow truckloads of black sludge to spill across the Rines' unprotected soil. Chesapeake then simply covered the waste with fill dirt and gravel. The waste remained in place, some remaining on the now-torn liner and much of it ending up on bare soil. Chesapeake left future cleanup or remediation that remained for the Rines alone to worry about.

On Friday, March 18, 2011, counsel for Chesapeake contacted counsel for the Rines and notified them of an emergency slip repair that had to begin on the Rine property on Monday, March 21. Representatives of the parties gathered on site that day to observe a slip at one corner of the well pad. The Rines, not wanting the slip to progress, did not initially attempt to halt the project. Since the project began, hours of video have been accumulated, showing beyond question that the Rines' land is marbled with long veins of uncontained, unlined black waste,

stretching from twenty feet underground to the surface itself, and stretching far away from the slip. All of it emanates from the area of the pit liner. Chesapeake has twice advised the Rines that the digging is complete or very nearly complete, only to reverse itself and resume digging when another black vein is spotted. For much of the project Chesapeake denied that removal of the black material was its goal.

It is undisputed that Chesapeake now intends to remove all black waste it finds, though Chesapeake now apparently maintains the absurd proposition that it does not know what the waste is or where it came from. Chesapeake insists that it must remove the many veins of black material <u>wherever</u> they are found, even though doing so is carrying the project away from the slip. In fact, Chesapeake has steadily chased veins of black waste across the Rines' property and has hardly touched the slip that supposedly touched off the emergency.

Both parties have had the opportunity to take soil and water samples. The Rines' first analysis of the black waste shows that it is contaminated with petroleum hydrocarbons, including significant levels of diesel and benzene. Pl. Ex. A. Chesapeake has not told the Rines what its analysis, if it has any, shows. The Rines shared their results with Chesapeake, through counsel, orally within hours of receiving it themselves. The Rines demanded a halt to the work until fuller test results were available. Chesapeake refused to stop its work on the Rine property and continues to maintain that its scramble to cheaply and improperly clean up its mess is just a slip repair project.

### Argument and Authority

Pursuant to Federal Rule of Civil Procedure 65, this Court has the authority to enter a temporary restraining order and/or a preliminary injunction. A temporary restraining order may

be entered pending an evidentiary preliminary injunction hearing.  See, e.g., Weintraub v. Hanrahan, 435 F.2d 461, 463 (7th Cir. 1970).  A preliminary injunction may be entered without an evidentiary hearing where resolution turns on legal conclusions or where material facts are not in dispute.  Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 552 (6th Cir. 2007).  To establish the right to a preliminary injunction, the Plaintiffs must show (1) a substantial likelihood of success on the merits, (2) that they would suffer irreparable harm without injunctive relief, (3) that the balance of equities tips in the Plaintiffs' favor, and (4) that issuance of the injunction is in the public interest.  Winter v. Natural Resources Defense Council, Inc., 557 U.S. 7, __, 129 S.Ct. 365, 375 (2008).

**I.    The Rines are likely to succeed on the merits of claims of trespass, property damage, and improper waste disposal.**

**A. Chesapeake's action is a trespass with no relation to mineral production.**

Chesapeake is on the Rine property for purposes other than gas exploration and production, without the Rines' permission, and in the face of several requests to halt or delay work.  That is a trespass.

Under West Virginia law, it is recognized that where there has been a severance of the mineral estate, the mineral estate holders' "surface use must be for purposes reasonably necessary to the extraction of the minerals."  Buffalo Min. Co. v. Martin, 165 W.Va. 10, 14, 267 S.E.2d 721, 723 (W.Va. 1980) (citing Adkins v. United Fuel Gas Co., 134 W.Va. 719, 61 S.E.2d 633 (1950); Squires v. Lafferty, 95 W.Va. 307, 121 S.E. 90 (1924); Porter v. Mack Manufacturing Co., 65 W.Va. 636, 64 S.E. 853 (1909); 54 Am.Jur.2d Mines and Minerals s 210; 58 C.J.S. Mines and Minerals s 159; R. Donley, Coal Mining Rights and Privileges in West

Virginia, 52 W. Va. L. Rev. 32 (1949)).  Even more importantly:

> where implied as opposed to express rights are sought, the test of what is reasonable and necessary becomes more exacting, since the mineral owner is seeking a right that he claims not by virtue of any express language in the mineral severance deed, but by necessary implication as a correlative to those rights expressed in the deed. In order for such a claim to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner.

Buffalo Min. Co. v. Martin, 165 W.Va. 10, 18, 267 S.E.2d 721, 725-726 (W.Va. 1980).

Chesapeake's scramble to remove black waste cannot satisfy this standard.  The digging is not reasonably necessary for the extraction of the mineral.  It is not mineral extraction at all.  Even under Chesapeake's view it is removal of earth of unknown content, unknown origin and unknown extent.[1]  This last assertion proves Chesapeake's fallacy: it insists it will not cease digging until black material is gone, but it has no idea how far the black material stretches away from the slip.

The Rines are entitled to an immediate restraining order and the opportunity to prove that the project cannot be reconciled with Chesapeake's stated rationale.  Because Chesapeake admits that it will not stop digging until it removes all of the black material wherever it is found, it is highly likely that the Rines will prevail in showing that the project is impermissible waste removal and not slip repair at all.  Since the purposes of the entry exceed the mineral owners' rights, the project constitutes a trespass on the Rines' property.

### B.  Chesapeake is currently destroying the Rines' property, constituting

---

[1] It is curious, to say the least, that Chesapeake is so intent to remove material from the Rine property that it claims no responsibility for.  It is ridiculous for Chesapeake to maintain that it does not know how the waste material found its way into a pit that it created.

**unjustified and irreparable property damage.**

Chesapeake is hauling off hundreds of truckloads of the Rines' soil and presumably dumping it at a landfill. It did not ask the Rines' permission to take the soil and does not intend to. Indeed, despite the fact that the Rines have denied that permission to Chesapeake, the company continues to disrespect the Rines' clear property rights. The property damage is ongoing and irreversible. With every day that passes, Chesapeake continues to disregard the Rines' wishes and to subject them to future costs.

Chesapeake does not purport to own the surface of the Rines' property. Nonetheless, for the past three weeks, Chesapeake has been mixing its black waste with large quantities of the Rines' uncontaminated soil. The soil and the waste are trucked away, never to return. Chesapeake has essentially taken over the Rine property and refuses to leave claiming that it is accountable to no one except itself. Chesapeake apparently considers the confiscation and permanent disposal of the Rines' uncontaminated land to be among its mineral rights. The Rines are likely to show that Chesapeake had no permission and no right to truck away their soil in vast quantities over the Rines' objection. See Bullman v. D & R Lumber Co., 195 W.Va. 129, 133, 464 S.E.2d 771, 775 (W.Va. 1995) (affirming damages for trespassory removal of timber, including market value of timber, loss of property and repair of the land); see also Hark v. Mountain Fork Lumber Co., 127 W.Va. 586, 591-592, 34 S.E.2d 348, 352 (W.Va. 1945) (defining trespass as an entry onto another's ground without lawful authority, and doing some damage, however inconsiderable, to his real property).

### C. Chesapeake is subjecting the Rines to increased legal risk through uninformed and possibly illegal handling and/or disposal of the black waste.

Chesapeake has not informed the Rines where it is taking their soil and its black waste,

7

nor whether any pre-disposal treatment is being performed.  The waste is apparently being taken to a landfill, it is likely that Chesapeake is not informing the landfill of the soil contamination, since Chesapeake insists it does not know what is in the black waste.

In West Virginia, the operator-driver of every "solid waste motor carrier vehicle" arriving at a commercial landfill must declare, under oath and in writing, the state and county where the waste originated.  W.Va. Code § 24A-2-4b.  Failure to complete the declaration form is a crime.  Id.  The West Virginia Waste Characterization Form requires that waste generators characterize waste, including designation of any "special waste" under 33 CSR § 1-4.13.  Plaintiffs' Exhibit B (WV Waste Characterization Form and Instructions).  Special waste includes petroleum contaminated soil.  Pl. Ex. B; see also 33 CSR § 1-4.13k ("Soils contaminated with petroleum must be disposed of in a manner prescribed by the Secretary").  Given those laws, together with laboratory analysis showing petroleum hydrocarbons in the black waste, the Rines have grave concerns about the proper handling and disposal of the waste.  Just as importantly, the law's requirements for special treatment of petroleum-contaminated waste validates the Rines' concerns over Chesapeake's willful blindness to its own waste material.

If any improper handling or disposal has occurred, the Rines, as landowners of the site of origin, are subject to an increased liability risk.  The Rines have not been given any information at all regarding the disposal of the material.  Further, at the outset of the project, Chesapeake refused to execute an agreement that would indemnify the Rines if Chesapeake's project caused them damage.  On April 1, 2011, the Rines demanded a halt to the work pending analysis of the waste, advising that it only made sense for all parties to determine the type and extent of contamination before proceeding.  Plaintiffs' Exhibit C (e-mail from Plaintiffs' counsel to

Chesapeake's counsel). Chesapeake refused.

To be clear, Chesapeake insists it is not remediating the site. Instead, Chesapeake claims it is performing a purely visual exercise: if they see black, they dig it out. That is nonsensical. It is clear that the operation has become an improper, incomplete (and much less costly) method of remediating soil saturated with diesel and other contaminants. Contaminated soil is often detected through more precise (and costly) procedures. Often contaminated soil is remediated through the costly process of incineration and returned to the site. Chesapeake is mixing their waste with the Rines' own land and trucking it all away without any input from the Rines. The handling concerns alone justify maintenance of the status quo until the Rines can be assured that the material is being handled completely and legally. See, e.g., Freer v. Davis, 43 S.E. 64 (W.Va. 1903) (holding that where irreparable mischief is being done or threatened to real estate, going to the destruction of the substance of the estate, a court will enjoin the trespass and preserve the property); see also McClung v. Sewell Val. R. Co., 127 S.E. 53 (W.Va. 1924) (a court may enjoin a trespass where irreparable injury is being done or threatened).

## II. The Rines will suffer irreparable harm without injunctive relief.

Without injunctive relief, the Rines will continue to watch an entire hillside – their hillside – be trucked away forever. They will be subjected to potential liability for the impermissible disposal of waste from their property. Without a careful and thorough plan, the ongoing, ad hoc project may be incomplete and actually cause more damage than it remedies. Chesapeake initially estimated its operations would last from five to seven days. Chesapeake insisted more than a week ago that less than ten truckloads of material remained to be trucked offsite, in an attempt to dissuade the Rines from seeking preliminary relief from the Court. Since

9

that assurance, two more "end dates" have been committed to and then withdrawn, and an estimated 200 truckloads of soil and black waste have been moved offsite. Chesapeake now declines to estimate any length of the project. In short, harm to the Rines is ongoing, immediate, irreparable and significant.

### III. An injunction would not substantially harm Chesapeake.

An injunction will not harm Chesapeake's mineral rights in any way, and will not impede its natural gas production. The Rines seek swift and safe stabilization of the site. Chesapeake will continue its improper and unapproved remediation efforts unless this Court issues an order maintaining the status quo until Chesapeake comes up with a legal remediation plan approved by the Rines. There is no harm to Chesapeake from stabilizing the site and waiting to remediate the property until an acceptable plan can be developed. After all, Chesapeake placed the waste on the property more than a year ago. There was no hurry to remove it until the Rines initiated the instant action.

### IV. An injunction is in the public interest.

There is a clear public interest in ensuring proper waste disposal, waste handling, and the safety of Chesapeake's workers and contractors. There is a strong public interest in ensuring proper remediation of contaminated sites and full protection of surface water and groundwater. Most importantly, there is a strong public interest in ensuring that surface owners' rights are not trampled by mineral owners who assert entitlement to others' property beyond their legal rights.

### Relief Sought

The Rines respectfully move this Court to enter (1) a temporary restraining and (2) a preliminary injunction. The Rines seek an order requiring Chesapeake to:

    1.       Cease all earthmoving activity at the site, following necessary and limited stabilization of the excavation area.

    2.       Cease the transportation of soil and waste from the Rine property until an approved remediation plan is developed.

    3.       Vacate the Rine property except for activities necessary for mineral production.

Date:  April 10, 2011

           s/ John W. Barrett
John W. Barrett, Esq. (W.Va. Bar No. 7289)
209 Capitol Street
Charleston, WV 25301
jbarrett@baileyglasser.com
(304) 345-6555

Isak J. Howell, Esq. (Va. Bar No. 75011,
Admitted Pro Hac Vice)
117 E. Washington St., Suite 1
Lewisburg, WV 24901
isakhowell@yahoo.com
(540) 998-7744
       Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| LARRY AND JANA RINE, ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 5:11-CV-4 |
| CHESAPEAKE APPALACHIA, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**CERTIFICATE OF SERVICE**

    I, Isak J. Howell, counsel for Plaintiffs Larry and Jana Rine, certify that this 10th day of April, 2011, I served the foregoing Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order And/Or Preliminary Injunction by filing it with Clerk of Court using the EM/ECF system, which will send notification to Defendant's counsel of record:

    John J. Meadows, Esq.
    Timothy M. Miller, Esq.
    Robinson & McElwee, PLLC
    P.O. Box 1791
    Charleston, WV 25326


    ___s/ Isak J. Howell_____
    Isak J. Howell, Esq. (Va. Bar No. 75011, Admitted
    Pro Hac Vice)