**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**AT WHEELING**

**LARRY AND JANA RINE,**

        Plaintiffs,

                                   **CIVIL ACTION NO: 5:11-CV-4**

v.

**CHESAPEAKE APPALACHIA, L.L.C.,**

        Defendant.

**DEFENDANT CHESAPEAKE APPALACHIA, L.L.C.'s MEMORANDUM IN
OPPOSITION TO  PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER AND/OR PRELIMINARY INJUNCTION**

**<u>Introduction and Facts:</u>**

The matter before the Court may be simply stated as: should plaintiffs Larry and Jana Rine prevail in stopping the engineering repair of an earthen slip at the well site owned by defendant Chesapeake Appalachia LLC ("Chesapeake"), a lawful mineral rights lease holder? Defendant Chesapeake urges the Court to **DENY** the Motion and instead award it damages.

It is undisputed that defendant holds a valid lease over the mineral rights to the property. (See Rine Lease, attached as Exhibit A). It is further undisputed that, in 2009, defendant paid the Rines for property damages with respect to this well and that the Rines executed a legally-binding release of claims against Chesapeake for work at this well site (See Release, attached as Exhibit B). Chesapeake was quietly enjoying its mineral rights until November, 2010, when the Rines initiated this civil action for damages and requested that, *inter alia*, this Court issue an injunction to compel Chesapeake to remove certain drilling materials (hereafter "drill cuttings") which were left *in situ* on the property pursuant to a valid permit issued by the West Virginia

Department of Environmental Protection ("DEP") (See DEP Permit, attached as Exhibit C).  The civil action is in the early stages of discovery.

Unrelated to the civil action, on or about March 18, 2011, a slip was observed at the Rine well site. (See Photographs of Rine Slip, attached as Exhibit D). Because this civil action was pending and it involved the same physical area of the slip, Chesapeake informed counsel for the Rines that Chesapeake intended to repair the slip; invited the Rine's counsel to observe the work to be performed, and to allow testing of the soil that would be necessarily removed to repair the slip. Chesapeake mobilized a crew to repair the slip and stabilize the earth. The plaintiffs were fully informed of the proposed repairs to the slip and, indeed, agreed to a written protocol for site activities that included sampling of the soil and drill cuttings to preserve any evidence related to this civil action. (See Protocol, attached as Exhibit E).

However, subsequent to these agreements, the plaintiffs did not treat the slip repair as a engineering challenge, instead they took the opportunity to convert the repair of an engineering fault into an activist circus, complete with non-stop video recording, bodily interference with heavy equipment (despite safety concerns and warnings), threats to equipment operators, and generally used the opportunity to harass and annoy the employees and contractors of defendant - who were merely attempting to ensure that the slip at the well site did not damage the entire hillside or well pad within 80 feet of the well head.  Plaintiffs' unreasonable demands culminated in the filing of this Motion for Temporary Restraining Order and/or Preliminary Injunction (Docket No. 16) which contains baseless accusations simply not supported by the facts. Further, plaintiffs and their allies have peppered the press with misinformation about this slip repair and have attempted to convert these lawful activities into some general indictment against the

policies governing the development of mineral rights in West Virginia and/or to convince this Court that the slip repair was a ruse for some improper and sinister purpose.

Notwithstanding the antics of plaintiffs, Chesapeake is still pursuing the same outcome it did at the start– it wants the slip adjacent to its well repaired. Plaintiffs have not suffered any harm, let alone irreparable harm, and otherwise cannot meet the standards for a preliminary injunction.

### A.  Plaintiffs' Motion Should Be Denied Because Their Motion is Moot, Untimely and Not Supported by the Law.

Plaintiffs purportedly demanded the shut-down of work at the Rine site to obtain delay to have their sample results analyzed and evaluated. (See Exhibit 3 to Docket Number 16). Plaintiffs presented Chesapeake with a sample result prior to filing this Motion, and on the strength of plaintiffs' own test results (Exhibit 2 to Docket No. 16, in part), Chesapeake declined to stop work because Chesapeake was satisfied in the benign nature of the test results and Chesapeake did not want the slip to continue, and possibly to cause additional damage. (See Affidavit of Ernest Franz, Environmental Consultant, attached as Exhibit F)[1].  To gain their demanded delay, plaintiffs filed this Motion and ultimately achieved their goal with the entry of the Order dated April 12, 2011.[2]

No reason now exists (nor ever did) to hinder Chesapeake's removal of any soil from the property or to further delay the repairs to the site. No analytical data have been returned which would legally compel Chesapeake to alter its strategy of slip repair. In fact, and contrary to

---

[1] N.B. – each affiant cited in this Memorandum in Opposition shall be present to present oral testimony at the hearing scheduled for April 21, 2011, at the United States District Court for the Northern District of West Virginia.

[2] Plaintiffs did not notify the Court or counsel for Chesapeake that they were not going to post the bond ordered by the Court, until April 18.

plaintiffs' assertions, all analytical sample results heretofore provided by the plaintiffs do not prove that the removal of soil and slip repair should be abated.

Further, unrelated to the claims set forth in the Complaint filed in this case, plaintiffs complain about the ultimate destination of the so-called "waste", the drill cuttings left in place, suggesting that Chesapeake or its contractors may have violated state or federal hazardous waste laws, committed a crime, and arguing that some liability for Chesapeake's disposal of the soil from the slip repair would rest with the Rines. (Docket No. 17 at 8). However, the drill cuttings which were previously treated on-site, pursuant to valid DEP permitting, and which were removed as an incidental part of the slip repair are <u>specifically exempted</u> from being defined as "hazardous waste" by federal regulation 40 CFR 261.4(b)(5).  In July, 1988, the United States Environmental Protection Agency issued its Regulatory Determination for Oil, Gas and Geothermal Exploration, Development, and Production Wastes (July 6, 1988) (53 Fed. Reg. 25466) which stated that the regulation of oil and gas exploration and production waste under the Resource Conservation and Recovery Act (**"RCRA"**) Subtitle C is not warranted. Notwithstanding the law, plaintiffs believe they had some right to act as private attorneys general to police the actions of Chesapeake and demand that Larry and Jana Rine be the judges of whether Chesapeake has obtained the proper permits for disposal of the materials. Incredibly, plaintiffs contend:

> … with laboratory analysis showing petroleum hydrocarbons in the black waste, the Rines have grave concerns about the proper handling and disposal of the waste. Just as importantly, the law's requirements for special treatment of **petroleum-contaminated** waste validates the Rines' concerns over Chesapeake's willful blindness to its own waste material. [emphasis added] (Plaintiffs' Memorandum, Docket No. 17, at 8)

While exploration and development wastes are considered solid wastes, under West Virginia law, these materials are specifically permitted to be disposed in drilling pits pursuant to the

State's oil and gas statutes (See W. Va. Code § 22-15-2(31)). However, of course, Chesapeake was always using a landfill that had obtained the proper permits! (See Permit from Short Creek Landfill, attached as Exhibit G) In fact, Chesapeake's landfill operator's permit is specifically for **petroleum-contaminated** materials, precisely what the plaintiffs claim their test results show is in the drill cuttings. Plaintiffs' claims are not only baseless, but to have informed this Court that Chesapeake or its contractors may somehow be guilty of a crime or be culpable in a cover-up is not only false, it is injurious, and Chesapeake is entitled to compensation from the security posted pursuant to Rule 65(c) for its injuries subsequent to the entry of the Temporary Restraining Order.  If plaintiffs aren't made accountable for the improvident Temporary Restraining Order, presumably, they may even act as though they have some "right" to further police the business of the landfill operator, who also acting under a permit issued by the West Virginia DEP.

The Rines have variously characterized the materials[3] placed in the pit on the permitted site in terms which are both improper and potentially inflammatory and designed to improperly influence this Court that the materials in the pit (which were properly placed there pursuant to a validly issued state Department of Environmental Protection well work permit and now properly disposed in the Short Creek Landfill) have somehow been inappropriately or illegally handled by Chesapeake.  Additionally, the Rines perhaps thereby seek to improperly invoke the jurisdiction of this Court to consider speculative and unsubstantiated claims under state or federal environmental laws regarding the materials at issue when the same clearly have not been even

---

[3] The Rines inappropriately characterize the drill cuttings in their Complaint and other pleadings as, *inter alia* "natural gas drilling waste and other trespassing objects and materials," "waste materials resulting from the processes of hydraulic fracturing and natural gas drilling," "water, sand and various hazardous chemicals unknown to the Rines," "rock, metals and other contaminants," "foreign substances," "untreated liquids, solids, and semi-liquids," "waste water and materials," "drilling waste," "drilling waste and other material," "unknown hazardous waste," "hazardous waste,""drilling waste and other abandoned and uncontained materials," "pit contents, "black waste material," "black waste," "black material," "waste," and "hazardous substances."

raised, much less, appropriately pled under these laws, and where the same could not, in fact, be proven, factually or legally, in any event.

It is important to remember at the outset that nothing was placed in the pit on the Rine site other than "drill cuttings," as validly permitted by the West Virginia Department of Environmental Protection and as noted in Chesapeake Appalachia, LLC's Answer to Complaint for Injunctive and Monetary Relief.[4]  <u>W.Va. Code</u> §22-6-1 *et seq.* (2009) establishes an Office of Oil and Gas within the West Virginia Department of Environmental Protection and constitutes the complete regulatory scheme for the regulation of oil and gas well drilling in the State of West Virginia.  The Rines' attempt to characterize in an inflammatory fashion the materials originally placed in the permitted pit on the Rine site in a manner other than the drill cuttings which were in fact placed there ignores the existence of the safeguards and public process protections built into the comprehensive State oil and gas regulatory scheme.  The Rines raised no objection to the validity of the permit authorizing the on-site placement of drill cuttings during the pendency of the permit application process and at the time of permit issuance.  Notwithstanding that Chesapeake has met or exceeded these requirements, it nonetheless addresses below as to why any other remotely applicable environmental statue is not relevant to these proceedings.

1.    <u>West Virginia Hazardous Waste Management Act.</u>    The West Virginia Hazardous Waste Management Act, <u>W.Va. Code</u> §22-18-1 *et seq.* (2009) is the state counterpart to the federal Resource Conservation and Recovery Act, 42 U.S.C. §6901 *et seq.*  The State Act, by its terms, regulates the generation, treatment, storage, and disposal of hazardous waste from cradle to grave in West Virginia. West Virginia has received delegation from the federal Environmental Protection Agency to run the state program in lieu of the federal program.   The Rines, in their Complaint, <u>see</u> Paragraph 50, characterize the Chesapeake drill cuttings as

---

[4] Chesapeake Appalachia, LLC's Answer To Complaint For Injunctive and Monetary Relief, ¶ 7.

"hazardous waste," thereby implying (though not expressly stating) that the material is subject to regulation under the RCRA-delegated West Virginia hazardous waste program. As further pointed out in Defendant Chesapeake Appalachia, LLC's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction, drill cuttings have been exempt from regulation as hazardous waste, after a thorough and complete study by the federal Environmental Protection Agency since July 6, 1988,  (53 FR 25466) when EPA determined (which regulatory decision has been incorporated by reference into the State Hazardous Waste Management Act program)  that drill cuttings were not to be regulated as a "hazardous waste."[5]  Drill cuttings simply as a matter of law are not hazardous waste.  Therefore, this Court has no jurisdiction to consider any of the claims, either express or implied, of the Rines, which rely on the characterization of pit materials as "hazardous waste" under either the state or federal hazardous waste programs. It is also important to note that, while private rights of action exist in certain limited circumstances under both the state Hazardous Waste Management Act program, W.Va. Code §22-18-19 (2009),  and the federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a), nowhere are these types of claims alleged in the Complaint and, to the extent that they can be implied, the Rines clearly have failed to comply with the statutory requirements set forth in either of those statutes to maintain such a cause of action.

2.   Comprehensive Environmental Response, Compensation, and Liability Act.  The federal Superfund law, 42 U.S.C.S. §9601 *et seq.*, consists not so much of a federal regulatory program, as a federal clean-up scheme to address the long-term investigation and remediation costs of sites where generators of hazardous substances; past and present owners and operators of sites where hazardous substances have come to be located; and "arrangers for disposal" of

---

[5]   See  http://www.epa.gov/wastes/nonhaz/industrial/special/oil/index.htm  for a discussion of the historical background of EPA's consideration of the regulation of wastes generated during the exploration, development, and production of crude oil and natural gas.

hazardous substances are held responsible jointly and severally for the investigation or remediation costs of hazardous substance sites.   The Rines make one mention of the term "hazardous substances," in their Motion for Temporary Restraining Order and/or Preliminary Injunction of April 18, 2011, though no evidence suggests that the drill cuttings constitute or contain hazardous substances or that any private claim under Superfund is being made.   While private rights of action under CERCLA are clearly permissible, <u>see</u> 42 U.S.C. § 9607(a)(4)(B) and 42 U.S.C. § 9659, the statutory requirements with which the Rines must comply have clearly not been met in this case.   Additionally, there is no evidence that the federal EPA, which may expend response costs to investigate or remediate Superfund sites, has been involved or that the State of West Virginia has been involved under its much more limited Hazardous Waste Emergency Response Fund powers, <u>W.Va. Code</u> §22-22-1 *et seq.* (2009), or otherwise have a concern about the Rine site or any of the allegations raised by the Rines.

3.     <u>West Virginia Solid Waste Management Act</u>.   In its Memorandum in Support of Plaintiffs' Motion for Temporary Restraining and/or Preliminary Injunction (April 10, 2011 and April 18, 2011), the Rines raise vague and unsubstantiated claims about proper handling and disposal of the drill cuttings contained in the pit located on the Rine property, somehow implying that the materials are a "solid waste" under the West Virginia Solid Waste Management Act, <u>W.Va. Code</u> §22-15-1 *et seq.* (2009).   Chesapeake is unsure as to whether the Rines' claims relate to the original placement of the drill cuttings in the pit on the property or the subsequent relocation of the materials in the slip remediation to the Short Creek Landfill.   However, it should be noted that the definition of "solid waste" under the state Solid Waste Management Act specifically excludes from the definition of solid waste (and therefore coverage by the state Solid Waste Management Act) of ". . .the exploration, development, production, storage and recovery

of coal, oil and gas, and other mineral resources placed or disposed of at a facility which is regulated under chapter twenty-two, twenty-two-a, or twenty-two-b of this code [which includes the state oil and gas permitting system], <u>so long as the placement or disposal is in conformance with the permit issued pursuant to such chapters.</u>"   <u>W.Va. Code</u> §22-15-2(31) (2009) (emphasis added).   Thus, the West Virginia Legislature's clear intent was to not require a solid waste disposal permit under the West Virginia Solid Waste Management Act for oil and gas exploration and production wastes properly permitted by the State Office of Oil and Gas, which is precisely what has happened in the instant case.

If the Rines claim that Chesapeake drill cuttings, when removed from the pit, and taken to the Short Creek Landfill, were not handled in an appropriate or legal fashion, these claims are erroneous as well.   Appropriate regulatory approvals were obtained pursuant to the state Solid Waste Management Act, which qualified drill cuttings to be taken to the Short Creek Landfill. (See Exhibit F).

Finally, plaintiffs claim that they would suffer irreparable harm – that "[w]ithout injuctive relief, the Rines will continue to watch an entire hillside – their hillside – be trucked away forever." (Docket No. 17 at 9). Amazingly, plaintiffs made this statement <u>after</u> 491 truckloads of earth had already been removed and having been informed that only 40 or so additional loads needed to be removed before Chesapeake could finish the slip repair and restore the hillside. Because of the on-site meeting on March 21, 2011, and subsequent communication from Chesapeake, plaintiffs knew that earth would have to be removed to correct the slip, and yet, they only filed their "emergency" motion after approximately three weeks of excavation of 491 truckloads of earth had been removed and before the pit area could be filled and repair the hillside.   Incredibly, if plaintiffs had not delayed the slip repairs with their shutdowns, threats,

and harassment, followed by the filing of this Motion, "their hillside" would already be safely replaced and restored. Instead, all that remains is a muddy pit that is susceptible to additional slip damage. (See Photograph of current pit after 491 truckloads of earth removed, attached as Exhibit H). This Motion was moot when it was filed on a Sunday night and it is still moot or untimely now that Chesapeake has had an opportunity to respond.

## B. Plaintiffs' Motion Should Be Denied Because The Balance Of Interests Falls In Favor Of Defendant.

In crafting its Order, this Court properly relied upon the equitable factors set forth in *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346-47 (4th Cir. 2009), which sets forth a balancing test modifying the principles of *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 193–95 (4th Cir.1977). In evaluating the *Obama* factors in light of the facts now before the Court, the balance of interests clearly falls with the defendant.

### 1. The Rines are not likely to succeed on the merits of claims of trespass, property damage, and improper waste disposal.

#### A. Trespass - Defendant is not trespassing and the claims of the Rines are not likely to succeed on their merits.

Property rights are often exemplified as being analogous to a bundle of sticks. In this matter, the Rines hold several sticks in the bundle representing the land in dispute, but Chesapeake also holds one – a valid mineral lease (See Exhibit A). As an owner of part of this property, Chesapeake is entitled to certain rights, including the right to use the surface incident to the extraction of the minerals below the surface. *Buffalo Min. Co. v. Martin*, 165 W.Va. 10, 267, S.E.2d 721 (W.Va. 1980) (citing *Adkins v. United Fuel Gas Co.*, 134 W.Va. 719, 61 S.E.2d 633 (1950); *Squires v. Lafferty*, 95 W.Va. 307, 121 S.E. 90 (1924); *Porter v. Mack Manufacturing Co.*, 65 W.Va. 636, 64 S.E. 853 (1909). Contrary to the plaintiffs' assertions, the activities taking place on the Rine site are consistent with surface use for purposes "reasonably necessary for the

extraction of the minerals." *Buffalo Min. Co.* at 14. With a slip forming on the well pad, it is absolutely critical to repair the sliding soil or additional damage to the pad may result, and such damage could result in much more significant risk and cost to repair. (See Affidavit of Ashley Cowan, construction foreman of Chesapeake's crew, attached as Exhibit I). Further, Chesapeake's actions in this matter were undertaken to repair the slip incident to its mineral production rights and to prevent the slip from worsening. Removal of the more than 500 truckloads of soil, including the drill cuttings, was crucial in slip repair as the drill cuttings and pit liner, if they were allowed to slip over the steep hillside would have resulted in a significantly greater problem: loss of drill cuttings over the hill and the concomitant difficulties in recovering and removing same from down the steep outslope embankment. (See Exhibit I). Finally, the Rines' complaints about the nature of the drill cuttings or the transportation of the removed soil are baseless, as explained in A., *infra*. (See Exhibit G).

Under longstanding West Virginia law, the mineral owner (Chesapeake) has the right to use the surface of the land in such manner and with such means as would be fairly necessary for the enjoyment of the mineral estate. *Squires v. Lafferty*, 95 W. Va. 307, 309, 121 S.E. 90, 91 (1924). This rule, as well as the procedural allocation of responsibilities between judge and jury, were clearly summarized by the Fourth Circuit Court of Appeals, applying West Virginia law, in *Justice v. Pennzoil Company*, 598 F.2d 1339 (4th Cir. 1979), cert. denied, 444 U.S. 967 (1979). In *Justice*, the court noted that the rule of law in West Virginia, pursuant to *Adkins v. United Fuel Gas Co.*, 134 W. Va. 719, 61 S.E.2d 633 (1950), is that the issue of whether there has been unreasonable use of the surface by the owner of the mineral rights is one to be determined by the court.

> We do not think that whether the plaintiff's rights have been invaded, or whether the defendant has exceeded its rights are

> questions of fact for determination of the jury.  In a case where there is a dispute of fact, the jury should find the facts, and from such finding of facts by the jury it is the duty of the court to determine whether the use of the surface by the owner of the minerals has exceeded the fairly necessary use thereof, and whether the owner of the minerals has invaded the rights of the surface owner, and thus exceeded the rights possessed by the owner of such minerals.

598 F.2d 1341-42.

The Fourth Circuit further noted that a case such as this is a real property case arising under West Virginia law. 598 F.2d at 1342.  *Adkins* instructs that unreasonable use of land by a mineral owner is not measured by the tort standard of the ordinary reasonable man; rather, it is measured by concrete legal standards rooted in the common law.  *Id*.  Under the common law, the mineral owner/operator (Chesapeake) enjoys the same right to use the surface as does the surface owner (Plaintiffs) in order that both parties may benefit from their interests in the property estates.  *Id*. The Plaintiffs' common law claims do not in and of themselves state a cause of action upon which relief may be granted.  As noted above, the lease grants the mineral owners the right of way over and across the said tract and whatever else may be necessary to a full and free enjoyment of said petroleum and natural gas.

It was noted in *Justice v. Pennzoil Company*, 598 F.2d at 1343 that the "*Adkins* rule" is controlling.  In *Adkins*, the plaintiff brought an action of trespass on the case to recover damages for injury allegedly resulting to land as a result of the defendant's drilling of a gas well.  The plaintiff alleged that the defendant constructed a road over a portion of the land approximately 650 feet in length; graded the road by means of a bulldozer; constructed through corn and alfalfa fields a ditch approximately 250 feet long for the purposes of carrying water and other refuse from the well; constructed a ditch in which a gas pipe was laid; and installed a pipe on the surface of the land for the purpose of piping gas to the place of drilling for the operation of

machinery thereon.   Plaintiff further alleged that considerable water, oil and refuse were deposited on his garden which was close to the well drilled by the defendant.   Plaintiff further showed that about 3/10ths of an acre of the crop of alfalfa was destroyed; that approximately 7/10ths of an acre of such alfalfa could not be cut and was thus loss to the plaintiff; and that the corn land could not be plowed, because of the open drainage ditch.   61 S.E.2d at 634.   The court stated that the controlling question was whether the defendant in drilling and operating the gas well on plaintiff's lands, laying of pipes, etc., exceeded its rights as the owner of the gas underlying such land, the same issue presented herein.   61 S.E.2d at 635.

The court concluded that the defendant had the right to build a road, lay pipe, etc. if the same was reasonable and necessary for the production and transportation of gas.   61 S.E.2d at 636.   After reviewing the relative duties of court and jury in deciding the question of unreasonable use of the surface, and the relative rights of the mineral owner to use such surface as he deems reasonable and necessary to drill the well, the court summarized the law as applied to fact as follows:

> From all the evidence in this case, about which there seems to be little dispute, we can see no violation of the rights of plaintiff, nor can we perceive that the defendant exceeded its rights in drilling a gas well on the 50 acre tract of land owned by the plaintiff.  True, plaintiff suffered damages: he was deprived of a garden, of the land occupied by the ditches and the surface pipe, as well as the use of at least one acre of his alfalfa and corn which he might have produced from his land.  **But when he bought the land, he bought it subject to the rights of the owner of the minerals, who by virtue of owning such minerals also possessed the rights necessary to produce and transport the same as an incident to such ownership.**  The damages to the plaintiff are *damnum absque injuria*.  (Emphasis added) (Citations omitted).

61 S.E.2d at 636.

The most significant principle to be gleaned from this quotation is that the issue is <u>not</u> whether there has been some damage to the surface estate.  The mineral owner has the right to do so.  The question is whether the damages are the result of the unreasonable use of the surface by the mineral owner.  As noted in *Justice v. Pennzoil Company*, 598 F.2d 1339, 1342 n. 2 (4th Cir. 1979), property owners in West Virginia have no right to veto or prevent the reasonable use of the surface by the owner of the mineral estate, even if the surface is damaged.  This is merely a restatement of the definition of *damnum absque injuria* -- damage done, but without violation of a right in the injured party; a misfortune unaccompanied by a breach of a duty.  *Ritz v. City of Wheeling*, 45 W. Va. 262, 31 S.E. 993 (1898), overruled on other grounds, 214 S.E.2d 832, 858 (W. Va. 1975).

The policy behind the principle of *damnum absque injuria* is clear.  Where the surface owner or a predecessor-in-interest has entered into an oil and gas lease or when another party owns the mineral rights, the plaintiff can occupy the surface but with the express understanding that there certainly can be damage caused to the surface estate by the mineral owner or lessee.  As noted in *Adkins*, when the plaintiff bought the land, he bought it subject to the rights of the owner of the minerals, who by virtue of owning such minerals also possessed the rights necessary to produce and transport the same.

In this case not only would the *Adkins* rule seem to bar plaintiffs' claims, but the plaintiffs also accepted a payment for any damages which may arise from the construction of the well pad and gave Chesapeake a release of all claims.  (See Section B.1.B, *supra*).  Thus, there can be little doubt that plaintiffs' likelihood of succeeding on the merits is low, if not extinguished as a matter of law.

### B.   Release - The Rines' claims are barred by Release and are not likely to succeed.

The Rines are not likely to succeed in their claims because they previously executed a Release and have already received monetary compensation from Chesapeake. (See Release and Payment Records, attached as Exhibit J). Larry and Jana Rine agreed to "**release and discharge**" Defendant, "its employees, directors, officers, agents, contractors or assigns **from all claims or causes of action** for the **damages resulting from the construction of a well location** on and/or across certain lands owned by" the Rines, "**including damage to** fences, crops, timber, and other **surface features** in the immediate area of disturbance." (emphasis added)(Exhibit J). The monetary consideration set forth in the release was paid by Chesapeake to the Rines on or about September 22, 2009. (Exhibit J).

Under West Virginia law it is well-established that a party must repudiate a release in order to bring a claim.  It has been over one and one-half years since the release at issue was executed and the consideration accepted by the Rines.  Indeed, the release at issue was signed by the Rines and the Rines accepted the monetary consideration set forth in the release by depositing Chesapeake's check in September of 2009. (Exhibit J).  In the intervening one and one-half years, the Rines have never repudiated their release and cannot do so now.

Under West Virginia law "[a] party seeking to repudiate a release must act promptly in disavowing it . . . or else the party will be deemed to have ratified the agreement." *Berardi v. Meadowbrook Mall Co.,* 212 W. Va. 377, 384, 572 S.E.2d 900, 907 (2002) (per curiam).[6]

---

[6] In *Berardi*, commercial tenants brought suit against their landlord despite the existence of a written settlement agreement and release.  The tenants sought to avoid the agreement on the grounds of economic duress.  The Supreme Court of Appeals noted that the lawsuit was filed three (3) years after the settlement agreement and release was signed, and held that:

"Courts have found that the failure to repudiate within four months, seven months, eighteen months and three-and-one-half years resulted in ratification of agreements." *Id.* The Rines have not taken an essential step required in order to repudiate the release: the return to Chesapeake of the consideration paid thereunder. A plaintiff "cannot repudiate a written release of all claims arising out of his injuries . . . without returning everything of value received by him in consideration for the release, or offering to do so." Syl. Pt. 2. *McCary v. Monongahela Valley Traction Co.*, 97 W. Va. 306, 125 S.E. 92 (1924).[7] *Accord*, *Crawford v. Ridgely,* 143 W. Va. 210, 100 S.E.2d 665 (1957).[8]   Here, The Rines accepted $15,000 from Chesapeake as

---

A party seeking to repudiate a release must act promptly in disavowing it once the putative duress ends or else the party will be deemed to have ratified the agreement. *See Freedlander*, 706 F.Supp. at 1222 ("If the consideration passing at the time of the release is not returned, or the terms of the release are not challenged once the duress has passed, the release is ratified."). *See also International Halliwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc.,* 544 F.2d 105, 108 (2d Cir.1976) (similar-New York law); *Schmalz*, 739 S.W.2d at 768 (similar).   Courts have found that the failure to repudiate within four months, seven months, eighteen months and three-and-one-half years resulted in ratification of agreements. *See Dorn v. Astra USA*, 975 F.Supp. 388, 394 (D.Mass.1997) (collecting cases).

572 S.E.2d at 907-908.

[7] In *McCary*, the plaintiff had suffered personal injuries while a passenger on defendant's street car. The plaintiff had executed a release discharging all claims or demands arising out of his injuries sustained during the accident. Despite the existence of the release, the plaintiff brought suit and attempted to avoid the impact of the release by alleging, in part, that the release was obtained by fraud and misrepresentation, that the release was without adequate consideration and that he was mentally incompetent at the time he executed the release. The Supreme Court of Appeals held:

> There was no tender or offer to return the money received by plaintiff as a consideration for the release pleaded, nor is it alleged that the amount received by plaintiff was ever tendered to defendant at any time. The weight of authority seems to be, that if one seeks to rescind a settlement on the ground of fraud, mental incompetency or mistake, he must, after discovering the fraud or mistake, place the other party in statu quo, or offer to do so.

125 S.E. at 93.

[8] This principle of West Virginia law is not unique to our State. For example, the Seventh Circuit, in *Fleming v. U.S. Postal Service*, 27 F.3d 259 (1994), refused to allow a releasor to rescind a release for failure to tender the consideration, and reasoned:

> We can cut through all this doctrinal thrust and  parry by reminding the parties of one of the most elementary principles of contract law, strangely lost to sight in the jungle of doctrinal intricacies: that a party may not rescind a contract

consideration for the release, but desire to retain the monies while at the same time claiming that the release is invalid and urging this Court to ignore the plain meaning of the release.

The Supreme Court of Appeals' statement on the issue of timeliness of repudiation in *Berardi* is highly pertinent. 572 S.E.2d at 907, citing *Dorn v. Astra USA,* 975 F.Supp. 388, 394 (D. Mass. 1997) (collecting cases). Here, it has been over one-and-one-half years since the Rines executed the release; the Rines' failure throughout these periods to tender to Chesapeake the consideration paid under the release has resulted in its ratification by the Rines. The time for promptly repudiating the release has long since past now. The release must be strictly enforced because the Rines have waived any defenses to it they might have had.

Finally, public policy favors the settlement of claims over litigation.

> As a means of promoting judicial economy and facilitating the resolution of contested cases, we long have noted that settlements are favored under the laws of this State. In this vein, we have held that "[t]he law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold

---

without returning to the other party any consideration received under it . . . (citations omitted) . . .

The principle that a release can be rescinded only upon a tender of any consideration received is not a peculiarity of Illinois law; it is a general principle of contract law, Samuel Williston, 12 *Williston on Contracts* § 1460 (Walter H.E. Jaeger ed., 3d ed. 1970) . . . (citations omitted) . . . and would surely be a component of any federal common law of releases. Not even plaintiffs are helped in the long run by a rule allowing them to have their cake and eat it, for a defendant will not pay as much for a release that the plaintiff can challenge without having to repay the money as the price of maintaining the challenge. Whether the tender must always precede the institution of the suit, or whether, as courts now hold in equity cases (which this case is in part, as the plaintiff seeks reinstatement as well as damages), it is enough that the complaint contains an offer to restore the consideration, an offer that the court could enforce by a conditional judgment, 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 4.15, pp. 429-30 (1990), is a detail of no importance in this case. Neither tender nor offer was made.

*Id*. at 260-261. *See also* "Timeliness of tender or offer of return of consideration for release or compromise, required as condition of setting it aside," 53 A.L.R. 2d 757 (1957); "Return or tender of consideration for release or compromise as condition of action for rescission or cancellation, action upon original claim, or action for damages sustained by the fraud inducing the release or compromise," 134 A.L.R. 6 (1941).

> and enforce such contracts if they are fairly made and are not in
> contravention of some law or public policy.

*Horace Mann Ins. Co. v. Adkins*, 215 W. Va.  297, 303, 599 S.E.2d 720, 726 (2004), *quoting,*

Syl. Pt. 1,  *Sanders v. Roselawn Mem'l Gardens, Inc.*, 152 W. Va.  91, 159 S.E.2d 784 (1968).

*Accord*, *Floyd v. Watson*, 163 W. Va.  65, 68, 254 S.E.2d 687, 690 (1979) ("The general rule is

that a compromise or settlement agreement is favored at law").

As releasors who may no longer repudiate their Release, the Rines' motion for

preliminary injunction should be denied because they are <u>not</u> likely to succeed on the merits of

their claims.

      C.   <u>Plaintiffs' claims are barred because of the notion of Primacy, and, there is
no irreparable harm and Plaintiffs are not likely to succeed on the merits.</u>

Claims of environmental damages and improper handling of materials, such as those of

the plaintiffs' motion, although not alleged in the Complaint, are for province of the DEP or the

EPA first, not the Courts. Plaintiffs have lodged their grievance in the wrong forum. The law in

West Virginia is that one must obtain the certain permits from DEP which the Defendant has

obtained and followed. (See Exhibit C and G). Plaintiffs now ask this Court to make that law be

that not only is Chesapeake required to pass muster with DEP, but they must also pass the

scrutiny of Larry and Jana Rine and have the Rines re-approve those same DEP permits – but not

through the legislature, or during a regulatory comment period, or even by a grievance lodged at

DEP, but by a private party in Court against another private party property-interest holder?

Plaintiffs will presumably next challenge the validity of those DEP permits, but they

ought to have to start with DEP. A legal axiom states that it is the role of the judiciary "to

determine what the law is, not what it should be." *U.S. v. Dickerson*, 166 F.3d 667 (4th Cir.

1999), *rev'd on other grounds* (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60

(1803)). However, Plaintiffs ask this Court to ignore the law of the State of West Virginia with respect to the regulation of its own natural resources (through the state-employed engineers and scientists at DEP) and, instead, insist on placing this Court in the middle of a scientific evidentiary hearing complete with plaintiffs' private scientists, lab samples and testifying engineers.  Any "environmental" or "policy" arguments should therefore be deferred to the expertise of the administrative agencies charged with their enforcement.  See *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 420 (5th Cir. 1976).

### 2.   The Rines will <u>not</u> suffer irreparable harm without injunctive relief.

Even as surface owners, the Rines are prohibited from trespassing onto the well pad while Chesapeake is conducting its lawful and reasonable surface usage in removing its minerals. Accordingly, no harm will befall the Rines while Chesapeake is in the process of maintaining its own operations – the Rines cannot even access or use that part of the property. For this inconvenience of this reasonable use by the mineral owner, the Rines accepted a payment and gave Chesapeake a release. (See Exhibit B).  Further, the Rines may actually suffer harm if Chesapeake does not remove the earth and correct the slip. (See Exhibit I). The Rines' complaints about the nature of the drill cuttings or the permitted transportation of the soil are baseless, as explained in Section A., *infra*. Any inconvenience associated with the movement of earth and truckloads of materiel moving in and about the site will be abated as soon as the potentially dangerous condition – the slip – is repaired.

And even if the plaintiffs may have a cause of action that survives a motion for summary judgment, the damages that they may recover is limited and thus, there can be no "irreparable" harm.  With respect to the damage to realty, the damages recoverable are subject to the property

rule of law that limits claims to no more than the fair market value of the property.   *Justice v. Pennzoil Company*, 598 F.2d at 1343, (applying *Jarrett v. E.L. Harper & Son, Inc.*, 160 W.Va. 399, 235 S.E.2d 362 (1977)).

The *Jarrett* decision overruled the previous standard regarding temporary and permanent damages to the property, and adopted a single standard:

> When realty is injured the owner may recover the cost of repairing it plus his expenses stemming from the injury including loss of use during the repair period.  If the injury cannot be repaired or the cost exceeds the property's market value, then the owner may recover the money equivalent of its lost value plus his expenses resulting from the injury including loss of use during the time he has been deprived of his property.  * * * *

235 S.E.2d at 365.  This limitation clearly expresses the view one cannot recover more than the fair market value of the damaged property, and is consistent with similar holdings of the Court. See *Stenger v. Hope Natural Gas Co.*, 139 W.Va. 549, 80 S.E.2d 889, 897 (1954) (measure of recovery for property destroyed is limited to fair market value at time of destruction; for property not destroyed, the diminution in market value); *Akers v. Ashland Oil & Refining*, 139 W.Va. 682, 80 S.E.2d 884 (1954).

Plaintiffs' Motion for a Temporary Restraining Order and for Preliminary Injunctive relief is premised on the claim that Chesapeake is taking away for disposal soil that allegedly belongs to plaintiffs.  While Chesapeake denies this is so since Chesapeake also has the "right" to use the soil under West Virginia property law, and since the Plaintiffs previously executed a full release for all claims for property damage to the area in question, the fact remains that the damages, if any, recoverable by plaintiffs under their "lost soil" theory is compensable at law---the cost of replacement soil.  While Chesapeake would deny this is recoverable, it is clearly not

an "irreparable" harm since soil can be trucked out, and soil can be trucked back, if needed.  But in either event, under the *Jarrett* rule of law, if the cost of repair (replacement soil) exceeds the fair market value of the property, the landowner can recover no more than the market value of the property disturbed.  Plaintiffs' "irreparable harm" therefore, as a matter of property law, can be no more than the fair market value of the several acres at best of disturbed soil.

### 3. An injunction substantially harms Chesapeake and its rights as a mineral owner.

Mineral owners necessarily cause disturbance to the land when exercising their rights to remove their minerals. Drilling thousands of feet into the earth to extract minerals is not a *de minimis* touching of the property. However, the conduct of Chesapeake in repairing this slip has been characterized as reasonable and necessary to protect their well pad and their property. (See Exhibit I). Accordingly, to stop Chesapeake from its use of the surface, including repairing slips on the well pad, places Chesapeake in the position of potential exposure to significantly reduced costs and damage. (See Exhibit I).

Indeed, Chesapeake has suffered damages as result of the temporary restraining order and is entitled to payment from the bond assessed pursuant to Rule 65(c).

### 4. An injunction is against the public interest.

Defendant Chesapeake is trying to prevent an earth slide from damaging the Rines' land or damaging or destroying its well pad area. (See Exhibit I). Natural gas production is vital to the economy of the state of West Virginia and is in the public interest of West Virginia. Further, obedience to state and federal law is also within the public interest. As demonstrated above, the mineral owner, Chesapeake, has followed to the letter the requirements set forth by federal and state law with respect to extracting minerals from the site. (See Exhibit F and Exhibit G)  To allow surface owners the right to independently determine, and indeed, enjoin the mineral owner

is clearly against the public policy. West Virginia already has an Attorney General and the elected legislature of West Virginia has already created an agency whose role it is to protect the land and the citizens of the state in these circumstances – the Department of Environmental Protection. To grant this Motion for Preliminary Injunction would effectively transfer the powers of both the Attorney General of West Virginia and the West Virginia DEP to Larry and Jana Rine (and any other surface holder) and that would clearly be against the public interest.

### Conclusion

Accordingly, plaintiffs' Motion is moot and, further, the plaintiffs have failed to meet their burden of showing that the interests of the *Obama* factors rest in their favor. Therefore, plaintiffs Motion for Temporary Restraining Order and/or Preliminary Injunction should be **DENIED**.

In addition, because defendant Chesapeake has suffered damages, including, but not limited to the following: it has had to re-schedule work to accommodate the inability to remove earth from the property; it has had to hire experts; it has had to divert employees and contractors from other projects to visit the site, supply affidavits and appear and testify at the hearing on April 21, 2011; it has had to run water pumping trucks, daily, to prevent the slip from further deterioration; and for legal costs in defending this motion, defendant Chesapeake asks that this Court award it at a minimum the entire $50,000 bond required to be posted by plaintiffs pursuant to the Order of the Court dated April 12, 2011.

**CHESAPEAKE APPALACHIA, L.L.C.**

**By Counsel**

**ROBINSON & McELWEE PLLC**

/s/ John J. Meadows
Timothy M. Miller (W.V. Bar No. 2564)
John J. Meadows (W.V. Bar No. 9442)
P.O. Box 1791
Charleston, WV 25326
Phone: (304) 344-5800
Fax: (304) 344-9566

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**AT WHEELING**

**LARRY AND JANA RINE,**

          Plaintiffs,

                               **CIVIL ACTION NO: 5:11-CV-4**

v.

**CHESAPEAKE APPALACHIA, L.L.C.,**

          Defendant.

## CERTIFICATE OF SERVICE

I, John J. Meadows, counsel for defendant Chesapeake Appalachia, LLC, do hereby certify that on the 20th day of April, 2011, I electronically filed **DEFENDANT CHESAPEAKE APPALACHIA, L.L.C.'s MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** with the Clerk of this Court using the CM/ECF system which will send notification of such filing to the following:

                            John W. Barrett, Esquire
                            Brian A. Glasser, Esquire
                            209 Capitol Street
                            Charleston, West Virginia 25301

                            Isak J. Howell, Esq.
                            Law Office of Isak Howell
                            117 East Washington Street, Suite 1
                            Lewisburg, WV  24901
                                         Counsel for Plaintiffs

                            Timothy M. Miller (W.V. Bar No. 2564)
                            John J. Meadows (W.V. Bar No. 9442)
                            P.O. Box 1791
                            Charleston, WV 25326
                            Phone: (304) 344-5800
                            Fax: (304) 344-9566
                                         Counsel for Defendant

and that there are no non-CM/ECF participants in this matter.

                          /s/ John J. Meadows

{R0583386.1}